**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

**BRIAN T. BONNER,**

      **Plaintiff,**

**v.**                                  **Case No.: 5:15-cv-03332**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Irene C. Berger, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Summary Judgment, (ECF No. 13), and Defendant's Brief in Support of Defendant's Decision, (ECF No. 15), wherein Defendant requests that judgment be entered in her favor.

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's Motion for Summary Judgment, (ECF No. 13), to the extent that it requests

1

remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.   Procedural History

On December 14, 2011, Plaintiff Brian T. Bonner ("Claimant") protectively filed an application for DIB, alleging a disability onset date of August 5, 2011 due to "bulging discs and debilitating nerve damage." (Tr. at 159-60, 189). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 83, 95). Claimant filed a request for an administrative hearing, (Tr. at 102-03), which was held on January 9, 2014, before the Honorable I. K. Harrington, Administrative Law Judge ("ALJ"). (Tr. at 23-55). By written decision dated January 24, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 9-18). The ALJ's decision became the final decision of the Commissioner on February 12, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 10, 11). Thereafter, Claimant moved for summary judgment, and both parties filed memoranda in support of judgment in their favor. (ECF Nos. 13, 14, 15). Consequently, the matter is fully briefed and ready for resolution.

## II.   Claimant's Background

Claimant was 45 years old at the time he filed the instant application for

benefits, and 47 years old on the date of the ALJ's decision. (Tr. at 18, 160). He has a high school education and communicates in English. (Tr. at 188, 190). Claimant has previously worked as a sales contractor at a meat company and a sales associate at a home furnishing company and an oil company. (Tr. at 190).

## III.   Summary of the ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which

is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2016. (Tr. at 11, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 5, 2011, his alleged disability onset date. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease and peripheral neuropathy." (Tr. at 11-12, Finding No. 3). The ALJ considered Claimant's obesity, disorders of the ear, disease of the circulatory system, respiratory disorders, and migraines, and found them to be non-severe conditions. (Tr. at 12).

4

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 12, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except requires [*sic*] a sit/stand at will but will remain on task. The claimant may occasionally perform balancing, stooping, kneeling, crouching, and climbing ramps and stairs but never climb ladders, ropes or scaffolding, or crawl. The claimant must avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, vibration, and hazards such as unprotected heights and dangerous machinery.

(Tr. at 12-17, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 17, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 17-18, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1966 and was defined as a younger individual on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of transferable job skills. (Tr. at 17, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy, including work as an assembler, ticket taker, or price marker at the light exertional level. (Tr. at 17-18, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act and was not entitled to benefits.

(Tr. at 18, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed to properly evaluate the credibility of Claimant's statements regarding the intensity, persistence, and limiting effects of his pain. (ECF No. 14 at 16). Claimant insists that the ALJ improperly emphasized the objective medical findings in considering his reported symptoms. (*Id.* at 18). Moreover, Claimant asserts that the ALJ failed to recognize the findings that supported Claimant's description of his pain, including the results of Claimant's December 2011 MRI and the findings of Claimant's treating physicians. (*Id.* at 18-20). Claimant points out that he consistently visited J.J. Gordinho, M.D., for pain management from September 2011 to October 2013 and that he continuously complained of back pain. (*Id.* at 20-21). To the extent that the ALJ found Claimant's treatment with Dr. Gordinho to be "essentially routine with minimal objective findings," Claimant argues that the lack of objective findings by Dr. Gordinho is "a function of the nature of the treatment" because "[t]he purpose of the treatment [was] not the diagnosis and verification of a condition … but rather the management of [Claimant's] pain." (*Id.* at 20).

Claimant also contends that the ALJ inappropriately discredited his statements based on his failure to seek more aggressive treatment and to visit free clinics or the emergency room to receive treatment. (*Id.* at 21). Claimant asserts that he regularly visited Dr. Gordinho, which he was required to pay for out-of-pocket because he did not have health insurance. (*Id.*) Furthermore, Claimant argues that "[i]t is extraordinarily unlikely that [he] would receive specialized orthopedic care via any free clinic or emergency room," and he notes that an orthopedic specialist, Rajesh V. Patel,

M.D., recommended pain management with Dr. Gordinho for his back condition. (*Id.* at 21-22). In addition, Claimant avers that the ALJ neglected to accurately consider his reported activities of daily living. (*Id.* at 23). Lastly, Claimant asserts that the ALJ failed to properly account for his "steady work history" in assessing the credibility of his statements concerning his symptoms. (*Id.* at 24-25).

In his second challenge, Claimant insists that the ALJ failed to properly weigh the opinions of his treating physician, Dr. Gordinho. (*Id.* at 25). Claimant notes that Dr. Gordinho offered opinions as to Claimant's functional limitations and work capabilities at the request of Aetna, Inc., "for the purpose of obtaining permanent and total disability life insurance benefits." (*Id.* at 25-26). Claimant asserts that the ALJ erred when she discounted Dr. Gordinho's opinions simply because they were prepared as part of a disability insurance assessment. (*Id.* at 25). According to Claimant, Dr. Gordinho's opinions regarding Claimant's functional limitations essentially mirrored the type of opinions elicited by the SSA when determining eligibility for DIB. Consequently, there was no legitimate basis for the ALJ to reject the opinions for the reason given. (*Id.* at 26). Moreover, Claimant asserts that objective medical evidence, including diagnostic studies, support Dr. Gordinho's opinions. (*Id.*)

In response, the Commissioner contends that the ALJ's credibility determination is supported by substantial evidence. (ECF No. 15 at 10). The Commissioner insists that Claimant's allegations were inconsistent with the objective medical evidence, including a September 2011 CT scan, a December 2011 MRI, an August 2012 x-ray, treatment notes from Dr. Patel and Dr. Gordinho, and findings from a physical consultative examination. (*Id.* at 11-12). In addition, the Commissioner asserts that Claimant's course of treatment was conservative and that Claimant's

failure to seek more aggressive or frequent treatment was a permissible reason to discount his allegations. (*Id.* at 12-13). The Commissioner also argues that Claimant's use of a "self-prescribed cane" demonstrates that he was exaggerating his symptoms, since the consultative examiner found that Claimant did not require a cane to ambulate. (*Id.* at 13). Furthermore, the Commissioner insists that Claimant's activities of daily living belied his allegations regarding the severity of his symptoms. (*Id.* at 14). Finally, the Commissioner asserts that the opinions of non-examining state agency physicians contradicted Claimant's allegations of disabling impairments. (*Id.*)

With respect to Claimant's second challenge, the Commissioner responds that the ALJ's decision to discount Dr. Gordinho's opinions was supported by substantial evidence. (*Id.* at 15). First, the Commissioner argues that Dr. Gordinho's opinions were not corroborated by clinical findings. (*Id.*) Second, the Commissioner contends that Dr. Gordinho's opinions were rendered, in part, on the ultimate issue of disability, which is an issue reserved to the Commissioner. (*Id.* at 16). Third, the Commissioner emphasizes that Dr. Gordinho's opinions were provided for the purpose of aiding Claimant in obtaining private long-term disability insurance, rather than DIB. (*Id.*) Accordingly, Dr. Gordinho may have been unfamiliar with the SSA's program requirements. (*Id.*) Lastly, the Commissioner notes that the opinions of the non-examining state agency physicians contradicted Dr. Gordinho's opinion. (*Id.* at 17).

## V. <u>Relevant Medical History</u>

The undersigned has reviewed all of the evidence before the Court. The medical records and opinion evidence most relevant to this PF & R are summarized as follows.

### A. Treatment Records

On August 11, 2011, Claimant visited Ralph Simms, D.O., with complaints of

8

pain across his back. (Tr. at 286). Claimant indicated that he had a job "where he [could] only lif[t] 25 pounds now," but he lifted and carried a recliner at work, which caused him back pain. (*Id.*) Claimant reported undergoing two prior disc fusions. (*Id.*) Dr. Simms noted that Claimant exhibited tenderness in the lumbosacral region down into the right sciatica notch. (*Id.*) Dr. Simms recorded that Claimant's deep tendon reflexes were 1/4 patella on the left and "just about absent on the right." (*Id.*) Claimant was diagnosed with a lumbosacral strain/sprain, and Dr. Simms prescribed Ultram 50 mg for his pain. (*Id.*)

On August 22, 2011, Claimant presented to the emergency room at Raleigh General Hospital reporting that pain medication did not relieve his back pain. (Tr. at 289). Claimant stated that he had a history of chronic back pain and back surgery. (*Id.*) Claimant's treater noted that Claimant walked with a cane. (*Id.*) Claimant's lower back was slightly tender with palpation. (Tr. at 290). A straight leg-raising test was positive at seventy degrees on the right and negative on the left. (*Id.*) The treater noted that Claimant's back was painless with range of motion. (*Id.*) An x-ray of Claimant's lumbar spine revealed no acute lumbar spine process and an old L5-S1 spinal fusion, which appeared stable. (Tr. at 295). Claimant was assessed with acute low back pain. (Tr. at 290). He was given injections for his pain and prescribed prednisone, Naprosyn, and Vicodin. (Tr. at 291, 293).

On September 6, 2011, Claimant treated with Lisa Walker, FNP-BC, for chronic back pain. (Tr. at 356). Claimant informed Ms. Walker that he had been on pain medication for seven years to treat his back pain and that he stopped using pain medication because he did not like taking it. (*Id.*) However, at the time of his appointment, Claimant's current medications were recorded as prednisone, naproxen,

and hydrocodone-acetaminophen, which were prescribed during Claimant's emergency room visit. (Tr. at 358). Claimant indicated that he had done "ok" until August, when he began to experience increased pain and started to drag his right leg. (Tr. at 356). Claimant also reported numbness in both legs and used a cane to ambulate. (*Id.*) On examination, Ms. Walker observed that claimant's lumbar area was "very tender" and that Claimant could not touch his toes. (Tr. at 357). She assessed Claimant with lumbago and unspecified idiopathic peripheral neuropathy. (*Id.*) Claimant was prescribed Lyrica and Percocet, and Ms. Walker recommended that Claimant undergo a CT scan of his lumbar region. (Tr. at 358).

On September 13, 2011, Claimant underwent a CT scan of his lumbar spine. (Tr. at 321-22). The scan showed post-surgical changes of the lower lumbar spine; status post anterior and posterior fusion at L5-S1 level; and mild encroachment on bilateral L5-S1 lateral recesses by marginal osteophytes. (Tr. at 321). The scan also displayed mild concentric bulging of L4-5 and to a lesser extent L3-4 intervertebral discs, resulting in encroachment on lateral recesses, greater at L4-5 level. (Tr. at 321-22). Additionally, mild osteophytic changes of the bilateral L4-5 articular facet joints were observed. (Tr. at 322).

Claimant visited Rajesh V. Patel, M.D., on September 26, 2011 for his lower back pain. (Tr. at 312-14). Claimant reported that he underwent a fusion at L5-S1 in 2000, followed by a hardware removal, and that those procedures provided him relief for approximately one year. (Tr. at 312). Claimant indicated that his most recent problems with his lower back and both legs began on August 5, 2011. (*Id.*) Claimant indicated that his pain was severe, which he rated as an eight out of ten, and exacerbated by movement. (*Id.*) According to Claimant, nothing provided him relief. (*Id.*) Dr. Patel

recorded that Claimant's gait was antalgic, he exhibited a bilateral limp, and he used a cane to ambulate. (Tr. at 313). Claimant's range of motion in the lumbosacral spine was abnormal, limited, and produced pain. (Tr. at 312). Claimant's heel walk and toe walk were abnormal. (Tr. at 313). Dr. Patel observed that Claimant's lumbar spine was tender to palpation with a positive right trochanteric bursa. (*Id.*) Dr. Patel noted that Claimant's patella and Achilles reflexes were 1 bilaterally. (*Id.*) Claimant's right lower extremity exhibited decreased sensation to light touch. (*Id.*) A straight leg-raising test and crossed straight leg-raising test were positive bilaterally with back pain. (*Id.*) Dr. Patel recorded no muscle atrophy. (*Id.*) Dr. Patel diagnosed Claimant with post-fusion syndrome, post-laminectomy syndrome, lumbar degenerative disc disease, and additional disease. (Tr. at 314). Dr. Patel recommended that Claimant undergo a CT myelogram and that Claimant visit a pain clinic. (*Id.*) The following month, Claimant was unable to complete a lumbar myelogram test due to discomfort. (Tr. at 303).

On October 5, 2011, Claimant visited the office of J.J. Gordinho, M.D., for pain management. (Tr. at 351). Claimant reported that his pain was worse and that his insurance would not approve Lyrica, so he was taking Naprosyn and Percocet, which provided minimal relief. (*Id.*) Claimant indicated that he was unable to sit for long periods of time and that he had been dragging his right leg. (*Id.*)

On November 3, 2011, Claimant reported to Dr. Gordinho that his back pain had again worsened and that everything exacerbated his pain while medications only helped "some." (Tr. at 348). Dr. Gordinho assessed Claimant with degenerative disc disease and lumbago. (Tr. at 347). Claimant's prescriptions were renewed. (*Id.*)

Claimant underwent an MRI of his lumbar spine on December 7, 2011. (Tr. at 310-11). The MRI revealed a stable L5-S1 fusion with right-sided laminectomy defect.

(Tr. at 311). Apophyseal joint fusion bilaterally at the L5-S1 was observed to be stable. (*Id.*) The MRI also showed arthritic change involving the apophyseal joints bilaterally at L3-4 and L4-5 without significant canal or foraminal encroachment. (*Id.*)

The following day, Claimant informed Dr. Gordinho that his pain was worse since his last visit and that he had not been exercising as prescribed. (Tr. at 346). Claimant stated that standing and walking worsened his pain. (*Id.*) He rated his pain as a six out of ten. (Tr. at 345). Claimant's diagnosis remained the same and his prescriptions were renewed. (*Id.*)

On December 28, 2011, Claimant returned to Dr. Patel. (Tr. at 316-18). Dr. Patel recorded that Claimant's low back pain continued to be severe and that nothing provided him adequate relief. (Tr. at 316). Dr. Patel noted that the recent MRI of Claimant's lumbar spine revealed "some bulging" at L3-L4 and L4-L5 with a laminectomy at L5-S1. (Tr. at 317-18). Dr. Patel observed that Claimant's lumbosacral spine range of motion was normal and unlimited; however, Claimant experienced some pain on range of motion testing. (Tr. at 316). Claimant's gait was antalgic, and he used a cane to ambulate. (*Id.*) Claimant was able to perform a toe walk and heel walk. (*Id.*) Dr. Patel noted that Claimant exhibited tenderness to palpation in the lumbosacral spine area. (*Id.*) No spasm was observed, and Claimant's sensation to light touch was intact. (Tr. at 316-17). A straight leg raise test and crossed straight leg raise test were positive bilaterally for back pain. (Tr. at 317). Dr. Patel diagnosed Claimant with post-fusion syndrome, post-laminectomy syndrome, lumbar generative disc disease, and lumbago. (Tr. at 318). Dr. Patel explained that he did not see any significant nerve root impingement that would warrant surgery. (*Id.*) Dr. Patel opined that Claimant would be best served with pain management. (*Id.*)

12

Claimant again visited Dr. Gordinho on January 19, 2012. (Tr. at 344). Claimant reported that his back pain had not improved and that standing made his pain worse. (*Id.*) Claimant described his pain as an eleven out of ten. (Tr. at 343). Dr. Gordinho recorded that Claimant had no new problems and still experienced back pain. (*Id.*) Claimant's diagnosis remained the same. (*Id.*)

Claimant continued to treat with Dr. Gordinho throughout 2012. In February, Claimant told Dr. Gordinho that his pain was a nine out of ten, and Dr. Gordinho noted that Claimant had fallen. (Tr. at 341). In March, Claimant reported sharp pain in his lower left back and described his pain as an eight out of ten. (Tr. at 339-40). At his April appointment, Claimant indicated that sitting or standing for long periods aggravated his symptoms, and he stated that his back pain on the left side was worsening. (Tr. at 337-38). Claimant also remarked that he was unable to grip things. (Tr. at 337). In June, Claimant rated his pain as a seven out of ten. (Tr. at 335). During his July visit, Claimant again reported worsening back pain. (Tr. at 334). Claimant continued to use a cane to ambulate, but he denied any recent falls. (*Id.*) Claimant also described numbness in his hands and feet. (*Id.*) Upon examination, Claimant's lumbar area was tender, and he was unable to touch his toes. (*Id.*) At his August and September appointments with Dr. Gordinho, Claimant rated his pain as an eight out of ten. (Tr. at 332-33). In October, Claimant reported no new problems and indicated that his pain was a six or seven. (Tr. at 379). During his December appointment, Claimant stated that he was experiencing pain in his lumbar and cervical areas, and he described his pain as a ten out of ten. (Tr. at 378). He also informed Dr. Gordinho that he had recently fallen. (*Id.*) Upon examination, Claimant's cervical spine and lumbar spine were tender, and he was unable to touch his toes. (*Id.*) Dr. Gordinho diagnosed Claimant

with degenerative disc disease, lumbago, and cervicalgia. (*Id.*)

Claimant visited Dr. Gordinho multiple times in 2013, as well. In January 2013, Claimant reported aching and stabbing pain in his low back, neck, legs, and shoulder. (Tr. at 377). However, Claimant confirmed that he did not have any loss of bladder or bowel control. (*Id.*) Dr. Gordinho observed that Claimant's gait was antalgic, and he ambulated with a cane. (*Id.*) On examination, Claimant's thoracic spine and lumbar spine were tender. (*Id.*) Claimant was continued on Percocet. (*Id.*) The following month, Claimant stated that his pain level was a seven out of ten, although he denied any new pain. (Tr. at 376). Claimant exhibited tenderness of the lumbar spine, but he retained full range of motion. (*Id.*) At his March appointment, Claimant indicated that his back pain was eight out of ten. (Tr. at 375). He was again tender in the lumbar spine area; however, he possessed full range of motion. (*Id.*) The next month, Claimant reported pain in his low back, neck, and legs. (Tr. at 374). Dr. Gordinho observed that Claimant's gait was "very antalgic," and Claimant continued to use a cane. (*Id.*) Claimant's range of motion was limited by pain, and his cervical spine and lumbar spine were tender. (*Id.*) In July, Claimant stated that his pain was a ten out of ten and that he had again fallen. (Tr. at 372). Claimant's lumbar spine was tender, but he still retained full range of motion. (*Id.*) In September, Claimant reported that his pain was a seven out of ten, and he was continued on Percocet. (Tr. at 383). The following month, Claimant described his pain as a six out of ten, and Dr. Gordinho recorded that Claimant exhibited full range of motion. (Tr. at 382).

## B. Evaluation and Opinion Evidence

On October 5, 2011, Dr. Gordinho and Ms. Walker completed an Attending Physician Statement form provided by Aetna, Inc., for the purpose of private disability

insurance. (Tr. at 353-54). They noted that Claimant was diagnosed with lumbar encroachment, a bulging lumbar disc, and peripheral neuropathy. (Tr. at 353). They reported that Claimant experienced pain and numbness, and he was unable to stand or sit for long periods. (Tr. at 354). Claimant's gait was described as shuffling with dragging of the right leg. (*Id.*) Dr. Gordinho and Ms. Walker opined that Claimant possessed "no ability to work" due to his inability to push, pull, lift, or maintain continuous sitting or standing. (*Id.*) They were unable to determine how long Claimant would be prevented from working. (*Id.*) In support of their opinion, they cited a CT scan showing encroachment at L5-S1 and bulging at L4-5 and L3-4. (*Id.*) They stated that Claimant had "regressed" and felt that he should not participate in vocational rehabilitation because his activity was limited. (*Id.*)

Dr. Gordinho and Ms. Walker also filled out a Capabilities and Limitations Worksheet that same day. (Tr. at 355). They opined that Claimant could never climb, crawl, kneel, lift, push, pull, carry, bend, twist, or stoop. (*Id.*) According to Dr. Gordinho and Ms. Walker, Claimant could occasionally reach above his shoulder, forward reach, grasp, perform gross and fine manipulation, sit, stand, walk, and carry one to five pounds. (*Id.*) Claimant could drive for a limited period of time, but he could not operate hazardous machinery or power tools. (*Id.*) He had exposure limitations to heat, cold, dampness, chemicals, and radiation. (*Id.*)

On March 1, 2012, Narendra Parikshak, M.D., completed a Physical Residual Functional Capacity Assessment for the SSA. (Tr. at 62-64). As to exertional limitations, Dr. Parikshak opined that Claimant could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Tr. at 62-63). Dr.

Parikshak noted that Claimant must periodically alternate between sitting and standing to relieve his pain and discomfort. (Tr. at 63). Dr. Parikshak also indicated that Claimant had unlimited ability to push or pull. (*Id.*) With respect to postural limitations, Dr. Parikshak found that Claimant could occasionally climb ramps or stairs, balance, stoop, kneel, and crouch; however, Claimant should never crawl or climb ladders, ropes, or scaffolds. (*Id.*) Dr. Parikshak further concluded that Claimant had no manipulative, visual, or communicative limitations. (*Id.*) Regarding environmental limitations, Dr. Parikshak determined that Claimant should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and hazards, such as machinery or heights. (Tr. at 63-64). Claimant could have unlimited exposure to noise, fumes, odors, dust, and gases. (Tr. at 64). In explaining the RFC assessment, Dr. Parikshak observed that Claimant's straight leg-raising test was negative and that an MRI showed a stable L5-S1 fusion without significant canal or foraminal encroachment. (*Id.*) Dr. Parikshak also noted that Claimant had limited range of motion of the lumbar spine and an antalgic gait. (*Id.*)

On May 30, 2012, Dr. Gordinho completed another Attending Physician's Statement form provided by Aetna, Inc., for the purpose of "Permanent and Total Disability – Life Insurance." (Tr. at 368-70). Dr. Gordinho wrote that Claimant was diagnosed with lumbar fusion failure/bulging, lumbar encroachment, and peripheral neuropathy. (Tr. at 368). Dr. Gordinho noted that Claimant was prescribed Percocet, which could cause drowsiness, fatigue, and decreased reaction time. (*Id.*) Dr. Gordinho documented that Claimant had decreased deep tendon reflexes, numbness, pain, and difficulty with range of motion and bending. (Tr. at 369). Again, Dr. Gordinho concluded that Claimant was unable to work because he could not lift, pull, or maintain

position for a prolonged period of time. (*Id.*) Dr. Gordinho was unable to determine how long Claimant would be precluded from working. (*Id.*)

On June 13, 2012, Kip Beard, M.D., performed an Internal Medicine Examination for the West Virginia Disability Determination Service. (Tr. at 325-29). Dr. Beard recorded that Claimant complained of chronic back pain and headaches. (Tr. at 325). Claimant informed Dr. Beard that he underwent a lumbar fusion at L5-S1 in 2000, which he believed was related to a disc abnormality. (*Id.*) In 2001, Claimant required a hardware removal. (*Id.*) Claimant reported that he had back problems "over the years" and returned to work until August 2011, when his back pain increased. (*Id.*) Thereafter, Claimant began experiencing severe back pain and began dragging his right leg. (*Id.*) Claimant indicated that his pain was located in the middle and lower part of his back as well as his neck and legs. (Tr. at 326). He rated the pain as eleven on a ten-point scale. (*Id.*) Claimant also described numbness in both arms and legs. (*Id.*) Claimant stated that his leg numbness caused him to fall down steps in March 2012 and that the fall resulted in him hitting his head and losing consciousness. (*Id.*) Claimant described difficulty with bending, lifting, standing, walking, doing laundry, performing housework, and gardening. (*Id.*) He also reported feeling tired constantly, which prevented him from performing any prolonged activity. (*Id.*) Claimant told Dr. Beard that pain medication made his pain bearable for a period of time. (*Id.*) Claimant stated that he had been limited in seeking evaluation and treatment because he did not have health insurance. (Tr. at 325).

Dr. Beard observed that Claimant's gait was slow with back discomfort and that Claimant used a cane to ambulate. (Tr. at 327). Dr. Beard noted that he did not see "any absolute need" for Claimant to use a cane and that Claimant was able to stand

unassisted, as well as arise from his seat. (*Id.*) Claimant stepped up and down from the examination table, but complained of back pain while doing so. (*Id.*) During the examination, Claimant stood up and moved around several times after being in a seated position. (*Id.*) Claimant reported moderate discomfort while lying down. (*Id.*)

On examination, Dr. Beard recorded that Claimant reported pain with range of motion testing of the cervical spine, along with paravertebral tenderness. (Tr. at 328). Dr. Beard did not observe any cervical spine spasm. (*Id.*) Claimant similarly complained of pain with range of motion testing of the lumbosacral spine, and Dr. Beard recorded tenderness and palpable rigidity in that area. (*Id.*) Dr. Beard did not observe any lumbosacral spine spasm. (*Id.*) Claimant was able to bend to forty degrees and laterally bend to fifteen degrees on both sides. (*Id.*) He could stand on one leg without difficulty. (*Id.*) A seated straight leg-raising test was to ninety degrees bilaterally with back pain, and a supine straight leg-raising test was to fifty degrees bilaterally with back pain. (Tr. at 328-29). Claimant reported no radicular complaints. (Tr. at 329). Claimant's hips were not painful and retained normal range of motion. (*Id.*) Claimant's shoulders, elbows, hands, and wrists were nontender and showed no signs of redness, warmth, or swelling. (Tr. at 328). Claimant exhibited full range of motion in his shoulders, elbows, wrists, and hands. (*Id.*) Claimant was able to make a fist with both hands, and he was able to button or pick up coins with either hand. (*Id.*) Claimant's knees, ankles, and feet retained full range of motion and were nontender with no redness, warmth, or swelling. (*Id.*) Claimant's legs exhibited some nonspecific sensory loss, but no objective weakness or atrophy. (Tr. at 329). Dr. Beard recorded that Claimant's deep tendon reflexes were 1+ for his biceps, triceps, patellae, and Achilles. (*Id.*) Claimant declined to try a heel, toe, or tandem walk due to balance

18

concerns, and he was able to squat about one quarter of the way with back pain. (*Id.*)

Dr. Beard assessed Claimant with status post L5-S1 lumbar fusion according to history; chronic cervical, thoracic, and lumbosacral strain; apparent lumbar degenerative disc disease; shortness of breath, probable decondition, and exercise intolerance; headaches; and physical deconditioning. (*Id.*) In his summary of the examination, Dr. Beard noted that Claimant was able to ambulate without a cane, but did so with a limp on the right side. (*Id.*) Dr. Beard indicated that Claimant complained of significant pain and discomfort throughout the examination. (*Id.*) Dr. Beard stated that there was motion loss of the back and decreased reflexes, but straight leg-raising tests were negative. (*Id.*) Dr. Beard determined that there was no well-defined lumbar radiculopathy present during the examination. (*Id.*)

On July 10, 2012, Caroline Williams, M.D., reviewed the record and affirmed Dr. Parikshak's Physical Residual Functional Capacity Assessment as written. (Tr. at 79-80). Dr. Williams concluded that Dr. Beard's examination "reveal[ed] no significant findings that would change the initial assessment." (Tr. at 79).

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

**VII.   <u>Discussion</u>**

**A. The ALJ's Consideration of Dr. Gordinho's Opinion**

Addressing Claimant's challenges in reverse order, Claimant argues that the ALJ failed to properly weigh Dr. Gordinho's opinions. When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2).

Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source, and even greater weight to the opinion of a treating physician, because that physician is usually most able to

provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(1)-(2). A treating physician's opinion on the nature and severity of an impairment may be afforded controlling weight when the following two conditions are met: (1) the opinion is well-supported by clinical and laboratory diagnostic techniques and (2) the opinion is not inconsistent with other substantial evidence. *Id.* § 404.1527(c)(2). When a treating physician's opinion is not supported by clinical findings, or is inconsistent with other substantial evidence, the ALJ may give the physician's opinion less weight. *Mastro v. Apfel,* 270 F.3d 171, 178 (4th Cir. 2001).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must analyze and weigh all the medical opinions of record, taking into account the following factors: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ must provide "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (1996). "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* at *4. On the other hand, when there is persuasive contrary evidence in the record, a treating physician's opinion may be rejected in whole or in part. *Coffman v. Bowen,*

829 F.2d 514, 517 (4th Cir. 1987). Generally, the more consistent a physician's opinion is with the record as a whole, the greater the weight an ALJ will assign to it. *Id.* § 404.1527(c)(4). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (1996). In SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of

the Commissioner's statutory responsibility to determine when an individual is disabled." *Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

In this case, the ALJ recognized that Dr. Gordinho offered two opinions through Attending Physician Statement forms provided by Aetna. (Tr. at 16). Dr. Gordinho's first opinion was given in October 2011. (*Id.*) He concluded that Claimant was unable to work since August 15, 2011 and continuing indefinitely. (*Id.*) The ALJ noted Dr. Gordinho's determination that Claimant could not lift, push, pull, or continuously sit or stand. (*Id.*) The ALJ assigned "no probative weight" to the opinion provided by Dr. Gordinho in October 2011 for several reasons. First, the ALJ noted that the form was completed at the request of Aetna for the purpose of obtaining "Permanent and Total Disability Life Insurance Benefits." (*Id.*) As such, the ALJ found that it was unclear if Dr. Gordinho was familiar with the SSA's disability evaluation program or based his opinion on the entire record. (*Id.*) Second, the ALJ concluded that Dr. Gordinho's opinion was not supported by the objective clinical findings, which the ALJ described as "mild." (*Id.*) Third, the ALJ indicated that Dr. Gordinho's opinion that Claimant could not work concerned an issue reserved to the Commissioner, and thus, his opinion in that area was "not entitled to any special significant weight." (*Id.*)

The ALJ also acknowledged Dr. Gordinho's opinion contained in an Attending Physician Statement completed in May 2012. (*Id.*) Dr. Gordinho again opined that Claimant was unable to work indefinitely. (*Id.*) In addition, Dr. Gordinho asserted that Claimant could not lift, pull, or maintain position for a prolonged period of time. (*Id.*) As with Dr. Gordinho's first opinion, the ALJ assigned "no probative weight" to the

second opinion. (*Id.*) The ALJ again emphasized that the form was completed for the purpose of obtaining "Permanent and Total Disability Life Insurance Benefits" from Aetna. (*Id.*) Consequently, the ALJ questioned whether Dr. Gordinho was familiar with the SSA's disability program and whether Dr. Gordinho based his opinion on the entire record. (*Id.*) Furthermore, the ALJ concluded that Dr. Gordinho's particular statements regarding functional limitations were "somewhat vague and fail[ed] to outline specific[ally] [Claimant's] abilities on a function-by-function basis." (*Id.*) Lastly, the ALJ pointed out that Dr. Gordinho's opinion that Claimant was unable to work related to an issue within the sole province of the Commissioner. (*Id.*)

The ALJ's RFC discussion also summarized other medical opinion evidence. (*Id.*) The ALJ assigned "substantial weight" to the opinions of Dr. Parikshak and Dr. Williams. (*Id.*) The ALJ reasoned that the two physicians were familiar with the SSA's disability program and supported their opinions with an explanation. (*Id.*) The ALJ indicated that, although these medical consultants did not examine Claimant, their opinions reflected "a thorough review of the available record and [were] supportable." (*Id.*)

The Fourth Circuit very recently discussed, in *dicta*, the adequacy of an ALJ's evaluation of medical opinion evidence in *Monroe v. Colvin*, ____ F.3d ____, 2016 WL 3349355, at *11 (June 16, 2016). In *Monroe*, the ALJ assigned "limited weight" to the opinions of two consultative examiners who concluded that the claimant experienced limitations in his ability to sustain attention and effort, construct interpersonal relationships, and master basic directions or procedures reliably and safely. *Id.* at *6, *11. The ALJ explained that the opinions were entitled to "limited weight" because "the objective evidence or the claimant's treatment history did not support the consultative

examiner's findings." *Id.* at *11 (quoting the ALJ's decision). The Court determined that the ALJ's reasoning was deficient as "the ALJ did not specify what 'objective evidence' or what aspects of Monroe's 'treatment history' he was referring to." *Id.* Consequently, the Court concluded that the ALJ's "analysis [was] incomplete and preclude[d] meaningful review." *Id.*

The Fourth Circuit also addressed the weighing of opinion evidence in *Fox v. Colvin*, 632 F. App'x 750, 756 (Dec. 17, 2015). In that case, the ALJ assigned "less weight" to a treating physician's opinion regarding the claimant's physical limitations because the ALJ found that the limitations were "not well-supported by the medical record." *Id.* at 752, 756. The Court concluded that the ALJ's "cursory and conclusory" explanation regarding the weight assigned to the physician's opinion prevented meaningful review of the administrative decision. *Id.* at 756. The Court stressed that the ALJ had failed to explicitly discuss how the physician's opinion was inconsistent with other medical findings. *Id.*

Having thoroughly reviewed the ALJ's written decision, the undersigned **FINDS** that the ALJ's evaluation of Dr. Gordinho's opinions is not supported by substantial evidence for at least two reasons. First, some of the reasons offered by the ALJ for discounting Dr. Gordinho's opinions are simply not valid. Second, the ALJ failed to sufficiently explain her finding that the objective evidence did not support Dr. Gordinho's opinions, and thus, the Court cannot meaningfully review the ALJ's conclusion.

To begin, the ALJ offered two unconvincing reasons for discounting Dr. Gordinho's opinions. First, the ALJ reasoned that Dr. Gordinho's opinions were entitled to "no probative weight" because his opinions were provided to Aetna, and as

such, Dr. Gordinho may not be familiar with the requirements of SSA's disability program. However, the ALJ merely speculated that Dr. Gordinho was not familiar with the program requirements, and the ALJ's guess was not a sufficient reason for discounting a treating physician's opinion. *See Horton v. Comm'r of Soc. Sec.*, No. 4:15-cv-8, 2016 WL 1381839, at *10 (W.D. Va. Apr. 6, 2016); *Wallace v. Comm'r, Soc. Sec.*, No. RDB-13-1273, 2014 WL 460844, at *2 (D. Md. Feb. 4, 2014); *Smith v. Colvin*, No. 1:12-CV-237, 2013 WL 5436828, at *6 (N.D. Ind. Sept. 27, 2013); *Wells v. Astrue*, No. 10-1811, 2011 WL 940492, at *5 (E.D. Pa. Feb. 25, 2011). Moreover, the ALJ failed to explain how Dr. Gordinho's lack of familiarity with the SSA's disability program affected the reliability of his opinions. Perhaps the ALJ meant that Dr. Gordinho's ultimate opinion as to disability was dubious because the definition of disability for Aetna differed from the SSA's definition; however, that fact would not impact the accuracy of Dr. Gordinho's findings as to Claimant's functional limitations. Indeed, even assuming *arguendo* that Dr. Gordinho had no knowledge of the SSA's disability program, his opinions concerning Claimant's functional limitations was relayed in terms that were compatible with those used by the SSA in assessing any claimant's functional capacity. *See Gutierrez v. Comm'r of Soc. Sec. Admin.*, No. CV 15-1439, 2016 WL 1305096, at *2 (C.D. Cal. Apr. 1, 2016); *Orsi v. Colvin*, No. 2:14-CV-142, 2015 WL 5685646, at *12 (E.D. Tenn. Sept. 24, 2015). In addition, Dr. Gordinho's functional limitations opinions could not be discounted solely because they were provided for the purpose of obtaining private disability insurance. *See Daniel v. Colvin*, No. 1:14-CV-775, 2015 WL 5530210, at *3-*4 (S.D. Ohio Sept. 21, 2015) (remanding for ALJ to consider opinion of treating physician provided for purpose of obtaining private long-term disability insurance benefits); *Mladucky v. Colvin*, No. 13 C 5324, 2014 WL

26

3584326, at *8 (N.D. Ill. July 21, 2014) (stating that ALJ cannot assign "no weight" to treating physician's opinion for reason that opinion was prepared for private insurance carrier).

Second, the ALJ's rejection of Dr. Gordinho's second opinion as vague is similarly unpersuasive. In his second opinion, Dr. Gordinho unequivocally found that Claimant was unable to perform lifting or pushing based on MRI results, Claimant's numbness and decreased deep tendon reflexes, and his difficulty with lumbar range of motion and bending. (Tr. at 369). Although Dr. Gordinho also opined that Claimant must "limit prolonged positions," without defining what constituted "prolonged," the term "prolonged" in this instance was not undecipherable—it meant Claimant could not perform sufficient sitting or standing to complete an entire workday. (*Id.*) Furthermore, the ALJ did *not* find that Dr. Gordinho's similar statements in the first Attending Physician Statement form were vague, wherein Dr. Gordinho opined that Claimant could not lift, push, pull, or "maintain continuous sitting or standing." (Tr. at 354). Additionally, the ALJ could have looked to the Capabilities and Limitations Worksheet that accompanied the first Attending Physician Statement to resolve any confusion regarding Dr. Gordinho's second opinion. (Tr. at 355).

Next, the ALJ neglected to adequately explain her finding that the objective evidence did not support Dr. Gordinho's opinions, and therefore, the Court cannot meaningfully review the ALJ's conclusion. The ALJ cited Exhibits 2F and 6F to support her conclusion that Dr. Gordinho's first opinion was "unsupported by the mild objective clinic [*sic*] findings." (Tr. at 16). However, those exhibits encompass nearly all of the treatment records in Claimant's file, and the ALJ failed to cite specific pages from those exhibits to support her conclusion. The ALJ also neglected to spell out the

27

particular information in those exhibits that undermined Dr. Gordinho's opinion. *See Richards v. Astrue*, No. 1:12-cv-832, 2012 WL 7006345, at *10 (N.D. Ohio Dec. 17, 2012) (finding that ALJ's listing of exhibits that purportedly contradicted treating physicians' opinions, without discussing information in those exhibits, did not amount to offering "good reasons" for rejecting opinions). Certainly, there were some findings within those exhibits that supported Dr. Gordinho's conclusions. Although this Court is confined to substantial evidence review, which permits an ALJ's decision to be affirmed despite conflicting evidence, an ALJ cannot simply cite entire exhibits that partially validate and partially contradict her decision with the belief that a reviewing court will comb through the record to uncover the supporting medical findings. *See Martin v. Colvin*, No. 1:14CV516, 2015 WL 5944455, at *9 (M.D.N.C. Oct. 13, 2015) ("[J]udicial review does not require the Court to comb the ALJ's recitation of a claimant's treatment history to piece together substantial evidence that conflicts with the treating source's opinion."). Because the ALJ failed to sufficiently elucidate and justify her finding that the objective evidence did not support Dr. Gordinho's opinions as to Claimant's functional limitations, the ALJ's "analysis is incomplete and precludes meaningful review." *Monroe*, 2016 WL 3349355 at *11.

Therefore, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be remanded so that the ALJ may reconsider, or elaborate on her discussion of, Dr. Gordinho's opinions. *See Farley v. Colvin*, No. 2:15-cv-7183, Dkt. No. 13 at 33-34 (S.D.W.Va. May 12, 2016) (recommending remand where ALJ assigned "little weight" to treating physician's opinion based on ALJ's belief that "the treatment records [did] not support [the] degree of limitation" because ALJ failed to specify those treatment records which

conflicted with the physician's opinion and failed to analyze treatment records anywhere in RFC discussion that would explain weight assigned to physician's opinion); *McCauley v. Colvin*, No. 4:14-cv-4236, 2016 WL 943669, at *2 (D.S.C. Mar. 15, 2016) (remanding where ALJ assigned "little weight to [treating physician's opinion] because of the lack of record support" and concluding that ALJ's explanation did not permit meaningful review); *Stringfield v. Colvin*, No. 7:14-CV-209, 2016 WL 889357, at *7 (E.D.N.C. Feb. 19, 2016) (finding remand warranted where ALJ assigned "little weight" to treating physician's opinion because ALJ believed that opinion was "not consistent with the objective evidence of record" and recognizing that "it was incumbent upon the ALJ to explain his decision to discount [the] opinion, rather than leaving the court to speculate as to what evidence the ALJ believed to be inconsistent and why."), *report and recommendation adopted by* 2016 WL 868197 (E.D.N.C. Mar. 7, 2016); *Marshall v. Colvin*, No. 1:14CV542, 2015 WL 5970435, at *4-*5 (M.D.N.C. Oct. 14, 2015) (finding that ALJ failed to sufficiently explain reason for discounting consultative examiner's opinion where ALJ concluded that examiner's opinion was entitled to "no weight" because opinion was" fully contradict[ed]" by medical findings without specifically identifying those medical findings).

## B. The ALJ's Analysis of Claimant's Reported Symptoms

Claimant also contends that the ALJ erred in assessing the credibility of Claimant's statements regarding the persistence, severity, and limiting effects of his symptoms. Pursuant to 20 C.F.R. § 404.1529, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R.

29

§ 404.1529(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." SSR 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).[1] Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained

---

[1] The SSA recently provided guidance for evaluating a claimant's report of symptoms in the form of SSR 16-3p. In doing so, the SSA rescinded SSR 96-7p, 1996 WL 374186, which the parties relied on in their memoranda. The undersigned finds it appropriate to consider Claimant's second challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow

treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine

if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, after summarizing Claimant's testimony at the administrative hearing, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms; however, the ALJ concluded that Claimant's statements concerning the intensity, persistence, and limiting effects his symptoms were not entirely credible. (Tr. at 13). The ALJ supplied a number of reasons for discounting Claimant's statements. First, the ALJ found that the clinical findings did not support Claimant's allegation of disabling symptoms. (*Id.*) The ALJ emphasized that an August 2011 x-ray showed no acute lumbar spine process, and a September 2011 CT scan revealed mild encroachment on the bilateral L5-S1 lateral recesses by marginal osteophytes, mild concentric bulging of L4-L5 and L3-L4 resulting in encroachment on lateral recesses, and mild osteophytic changes of the bilateral L4-L5 articular facet joints. (*Id.*) In addition, the ALJ noted that a December 2011 MRI showed a stable L5-S1 fusion and arthritic changes involving the apophyseal joints bilaterally at L3-L4 and L4-L5, but no significant canal or foraminal encroachment. (Tr. at 14). Furthermore, the ALJ remarked that Claimant's follow-up appointment with Dr. Patel demonstrated that Claimant improved with treatment.

33

(*Id.*) The ALJ also stressed Dr. Beard's observations that Claimant had no well-defined lumbar radiculopathy during the examination and that Claimant was able to walk without a cane (albeit with a limp). (*Id.*) Additionally, the ALJ remarked that Claimant's straight leg raise tests were negative during the examination. (*Id.*) Moreover, the ALJ asserted that Dr. Gordinho's treatment evidenced "essentially routine visits with minimal objective findings." (*Id.*)

Second, the ALJ noted that Claimant failed to seek more aggressive treatment. (Tr. at 15). Although Claimant testified that he had limited finances and no health insurance, the ALJ concluded that "a lack of health insurance does not equate to a finding of disability." (*Id.*) Relatedly, the ALJ criticized Claimant's failure to "exhaust all efforts to seek treatment," such as visiting free clinics or the emergency room. (*Id.*)

Third, the ALJ noted that Claimant reported in an Adult Function Report that his medications caused him lightheadedness; however, the ALJ determined that the treatment records did not support this claim. (*Id.*) Rather, the ALJ found that the treatment records demonstrated that Claimant's medications provided him some relief from his symptoms. (*Id.*)

Fourth, the ALJ acknowledged Claimant's use of a cane, but noted that the cane was not prescribed. (*Id.*) The ALJ asserted that Claimant's use of a non-prescribed cane suggested that he "overestimated his symptoms." (*Id.*) The ALJ went on to state that Claimant's use of a cane was "given only slight weight in reaching the conclusion regarding the credibility of claimant's allegations." (*Id.*)

Fifth, the ALJ recognized that Claimant reported limited activities of daily living; however, the ALJ concluded that Claimant's allegedly limited daily activities could not be "objectively verified with any reasonable degree of certainty." (*Id.*)

34

Moreover, the ALJ remarked that Claimant was able to mop his floors and pick up and move a recliner. (*Id.*) In addition, the ALJ determined that "even if [Claimant's] daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to [Claimant's] medical condition, as opposed to other reasons, in view of the relatively mild to minimal findings on objective clinical testing and other factors discussed in th[e] decision." (*Id.*)

Lastly, the ALJ indicated that Claimant changed positions frequently during the administrative hearing, but he was able to process and respond to questions without difficulty. (*Id.*) Because the hearing was "short-lived," the ALJ acknowledged that Claimant's behavior at the hearing "cannot be considered a conclusive indicator of [his] overall level of pain and functional ability on a day-to-day basis." (*Id.*) Notwithstanding, the ALJ determined that Claimant's ability to respond promptly and appropriately to questions at the hearing was an indicator of his ability "to remain on task despite [any] position changes." (*Id.*)

Because the undersigned has recommended that this case be remanded for the reasons above, an exhaustive discussion of the ALJ's justifications for discounting Claimant's statements is unnecessary. However, to aid the ALJ on remand, the undersigned suggests that the ALJ revisit particular reasons for discounting Claimant's statements regarding the persistence, severity, and limiting effects of his symptoms. First, the ALJ's reliance on Claimant's purported failure to seek more aggressive treatment or to "exhaust all efforts to seek treatment" is problematic. Although Claimant did not undergo any surgical procedures for his back pain during the alleged period of disability, Dr. Patel opined that Claimant's condition did not warrant surgery and that Claimant would be best served with pain management. As such, Claimant

35

treated with Dr. Gordinho and was consistently prescribed potent pain medication. In addition, Claimant visited Dr. Gordinho approximately once per month from October 2011 to November 2013, and it is unclear what benefit the ALJ believed that Claimant would have received from visiting a free clinic or an emergency room.

Second, the ALJ should reconsider discounting Claimant's statements based on his use of a non-prescribed cane. Claimant explained at the administrative hearing that he used a cane to ambulate because he had fallen on several occasions. (Tr. at 35-37). Although Dr. Beard noted that he did not see "any absolute need" for Claimant to use a cane based on his single examination of Claimant, treatment records substantiate Claimant's reports of experiencing falls and that Claimant often used a cane to ambulate. (Tr. at 341, 372, 378). As such, Claimant's utilization of a non-prescribed cane does not appear to be a tactic to obtain disability benefits, and the ALJ failed to adequately explain how Claimant's use of a cane without a prescription adversely affects the veracity of his statements. *See Eakin v. Astrue*, 432 F. App'x 607, 613 (7th Cir. 2011) ("[T]he fact that an individual uses a cane not prescribed by a doctor is not probative of her need for the cane in the first place."); *Krauze v. Astrue*, No. 11-1197, 2012 WL 2357250, at *9 (D. Ariz. June 20, 2012) ("The observation that Plaintiff used a cane when it had not been prescribed or deemed medically necessary by a physician provides little, if any, support to discredit Plaintiff's testimony."); *Robinson v. Astrue*, No. 09-0347, 2010 WL 433293, at *4 n.4 (S.D. Ala. Feb. 2, 2010) ("While it is certainly possible that a cagey claimant could add a cane to other efforts to exaggerate his claims to the agency or court, making such a conclusion from nothing other than the use of the cane without a prescription is unwarranted.").

Finally, the ALJ erred in her consideration of Claimant's activities of daily living.

36

First, the ALJ's boilerplate assertion that Claimant's "allegedly limited daily activities cannot be objectively verified" adds little, if anything, to the analysis of Claimant's statements. *See Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014). Second, the ALJ found that Claimant's daily activities were "rather robust," primarily citing Claimant's statement at an August 11, 2011 appointment that he had recently lifted a recliner, which caused him significant back pain. (Tr. at 15). However, the incident relied upon by the ALJ seems to coincide with Claimant's alleged disability onset date. (Tr. at 286, 312). As such, the ALJ used the event that triggered Claimant's alleged disability to demonstrate that Claimant's activities of daily living were "robust." In other words, the ALJ primarily depended on a single activity performed on, or prior to, the alleged onset date to discount Claimant's statements concerning his limited activities of daily living. Of course, this was error. Accordingly, on remand, the ALJ should reconsider Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's Motion for Summary Judgment, (ECF No. 13), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF & R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Berger, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  July 27, 2016

_____
Cheryl A. Eifert
United States Magistrate Judge